UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NGV GAMING, LTD., <br><br> Plaintiff, <br><br> v. <br><br> HARRAH'S OPERATING COMPANY, INC., a Delaware Corporation, <br><br> Defendant. | Case No. 04-3955 SC <br><br> ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION <u>FOR SUMMARY JUDGMENT</u> |

**I.   INTRODUCTION**

On May 8, 2009, Plaintiff NGV Gaming, Ltd. ("NGV" or "Plaintiff") filed a Motion for Partial Summary Judgment ("Pl.'s MPSJ"). Docket No. 189. Defendant Harrah's Operating Company, Inc. ("Harrah's" or "Defendant") filed an Opposition and NGV submitted a Reply. Docket Nos. 202 ("Def.'s Opp'n"), 215 ("Pl.'s Reply").

On June 12, 2009, Harrah's filed a Motion for Summary Judgment ("Def.'s MSJ"). Docket No. 203. Plaintiff NGV filed an Opposition and Harrah's submitted a Reply. Docket Nos. 226 ("Pl.'s Opp'n"), 237 ("Def.'s Reply"). For the reasons set forth below, the Court DENIES Plaintiff's Motion for Partial Summary Judgment and DENIES Defendant's Motion for Summary Judgment.

Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment includes a request for a Rule 56(f) continuance,

1  and Defendant also filed a Rule 56(f) affidavit. Def.'s Opp'n at
2  2 n.1; Docket No. 208 ("Rule 56(f) Aff."); Docket No. 245
3  ("Supplemental Rule 56(f) Aff."). Defendant's request for a
4  continuance is moot because the Court denies Plaintiff's Motion
5  for Partial Summary Judgment.

**II. BACKGROUND**

    **A. Factual Background**

On July 3, 2002, the Guidiville Band of Pomo Indians (the "Tribe") contracted with F.E.G.V. Corporation ("FEGV") for the latter to develop and construct a gaming facility on a to-be-acquired parcel of land in Northern California. Pl.'s MPSJ at 3-4. The Agreements comprised two separate documents: (1) a Development Agreement and Personal Property Lease (the "Lease"), and (2) a Cash Management Agreement. Id.; Siegel Decl. Ex. L (the "Agreements").[1] NGV was obligated under the Agreements to assist the Tribe in identifying and purchasing land to establish the trust land base on which the gaming facility would be built. Pl.'s MPSJ at 4. In exchange, NGV would be compensated through a combination of fixed payments and a percentage of gross and net revenues earned by the newly constructed gaming facility. Id. The Tribe was obligated to pay FEGV "Base Rent" equal to "the final total Pre-Development Costs, Construction Costs and Start-Up Expenses," "Additional Base Rent" equal to seventy-five percent

---

[1] Stanley E. Siegel, Jr., counsel for Defendant Harrah's, submitted a declaration in support of (1) Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment; and (2) Defendant's Motion for Summary Judgment. Docket No. 204.

2

1  (75%) of net revenue per month, and "Incentive Rent" equal to
2  sixteen percent (16%) of gross revenues per month. Agreements
3  §§ 6.1, 6.3. The term of the Lease was to continue until the
4  tenth anniversary of the date upon which the total Base Rent was
5  paid in full. Id. § 5. In December 2003, FEGV assigned to NGV
6  its rights and duties under the Agreements. Pl.'s MPSJ at 3-4.

7  In January of 2004, Upstream Point Molate, LLC ("Upstream")
8  was awarded the right to negotiate by the City of Richmond ("the
9  City") in connection with a potential sale by the City of
10 approximately 400 acres of land at Point Molate for the purpose of
11 constructing an Indian casino.[2] Id. at 4. Harrah's began
12 pursuing the Tribe in April 2004 to become its Indian gaming
13 partner at Point Molate. Id. On August 2, 2004, the Tribe sent a
14 letter to NGV rescinding the Agreements. Id. at 6; Siegel Decl.
15 Ex. K ("August 2, 2004 Letter"). The Tribe entered into a
16 contract with Harrah's on or about September 22, 2004. Siegel
17 Decl. Ex. G ("Dep. of Clayton Rice") at 102:12-15. Plaintiff NGV
18 maintains that the Tribe was induced to terminate the Agreements
19 as a result of Defendant's interference. Pl.'s MPSJ at 6.

20 **B.   Procedural Background**

21 NGV sued Harrah's and Upstream alleging the tort of
22 intentional interference with contractual relations. See Docket
23 No. 10 ("Second Am. Compl.") ¶¶ 38-44. The Court granted the

---

[2] NGV originally sued both Harrah's and Upstream. See Docket No. 6 ("Compl."). While the case was on appeal, the Ninth Circuit granted NGV's motion for the voluntary dismissal of Upstream from this action. See Guidiville Band of Pomo Indians v. NGV Gaming, Ltd., 531 F.3d 767, 772 (9th Cir. 2008).

3

Tribe's motion to participate as an amicus curiae. Docket No. 58 ("Jan. 31, 2005 Order"). The Tribe filed a separate lawsuit seeking declaratory and injunctive relief. See Guidiville Band of Pomo Indians v. NGV Gaming, Ltd., Case No. 05-01605. The Court consolidated that case with this one for purposes of discovery and motion practice. See Docket No. 69 ("May 26, 2005 Order"). On October 19, 2005, the Court granted the Tribe's motion for declaratory relief, denied NGV's motion for summary judgment, and dismissed the present case. See Docket No. 132 ("Oct. 19, 2005 Order"). The Court's decision was based on a finding that the Agreements were invalid for failure to comply with 25 U.S.C. § 81. Id. at 8.

The Ninth Circuit reversed this decision. Guidiville Band of Pomo Indians, 531 F.3d at 783. The Ninth Circuit held that the Tribe could not seek declaratory relief, that 25 U.S.C. § 81 and 25 U.S.C. § 2710 do not apply to the Agreements, and that those statutes do not invalidate the Agreements. Id. at 773-74, 783. On remand, the parties filed the summary judgment motions that are presently before the Court.

**III. LEGAL STANDARD**

Entry of summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S.

4

1  242, 248 (1986).  A dispute as to a material fact is "genuine" if
2  there is sufficient evidence for a reasonable jury to return a
3  verdict for the nonmoving party.  Id.  The court must not weigh
4  the evidence.  Id. at 255.  Rather, the nonmoving party's evidence
5  must be believed and "all justifiable inferences are to be drawn
6  in [the nonmovant's] favor."  United Steelworkers of Am. v. Phelps
7  Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc)
8  (quoting Anderson, 477 U.S. at 255).

## IV. DISCUSSION

NGV moves for partial summary judgment based on its contention that it has established, as a matter of law, each of the elements of tortious interference with contractual relations. Pl.'s MPSJ at 8.  Harrah's contends that it is entitled to summary judgment on the grounds that the evidence demonstrates that Harrah's did not proximately cause the Agreements to be terminated, and because Plaintiff's alleged damages are too speculative as a matter of law.  Def.'s MSJ at 4.  NGV also filed a Motion to Strike Defendant's Exhibit PP.  Docket No. 220 ("Motion to Strike").  Defendant filed an Opposition to the Motion to Strike, NGV filed a Reply, and Defendant filed a Surreply. Docket Nos. 227, 231, 239.[3]

### A. NGV's Motion to Strike

NGV moves to strike Exhibit PP, which is a letter from the

---

[3] Defendant moved for leave to file the Surreply.  Docket No. 238.  NGV opposed the request.  Docket No. 242.  The Court GRANTS the request.

5

President of the Tribe's Gaming Agency providing information concerning the Agency's September 2005 decision that NGV was not eligible to receive a license from the Tribe. See Mot. to Strike at 1; Siegel Decl. Ex. PP ("June 12, 2009 Letter"). NGV questions the trustworthiness of the Gaming Agency's decision to deny NGV a license. Mot. to Strike at 5-11. The Court finds that the June 12, 2009 Letter is admissible because Terry Springer, the President of the Gaming Agency and the letter's author, declares under penalty of perjury that everything stated in the letter is truthful and accurate. See Springer Decl.[4] While NGV raises questions concerning the credibility of the Gaming Agency's decision that NGV was ineligible for a license, credibility determinations are jury functions. See Anderson, 477 U.S. at 255. The Gaming Agency's decision was based, in part, on an investigative report authored by the Spinelli Corporation and Lewis and Roca LLP. See June 12, 2009 Letter. If Harrah's attempts to introduce this report at trial, then NGV can challenge its admissibility by filing a motion in limine. The Court DENIES NGV's Motion to Strike.

**B. Intentional Interference with Contract**

Under California law, "[t]he elements of a cause of action for intentional interference with contract are: (1) a valid contract between plaintiff and a third party; (2) defendants' knowledge of the contract; (3) defendants' intentional acts

---

[4] Terry Springer, President of the Guideville Band of Pomo Indians Gaming Agency, filed a declaration in support of Harrah's Opposition to NGV's Motion to Strike. Docket No. 229.

6

1  designed to induce a breach or disruption of the contractual
2  relationship; (4) actual breach or disruption of the contractual
3  relationship; and (5) resulting damage." Tuchscher Dev. Enters.,
4  Inc. v. San Diego Unified Port Dist., 106 Cal. App. 4th 1219, 1239
5  (Ct. App. 2003).  In a suit for intentional interference with
6  contract, the plaintiff must show that the act complained of was
7  the proximate cause of the injury. Bauer v. Interpublic Group of
8  Companies, Inc., 255 F. Supp. 2d 1086, 1095 (N.D. Cal.
9  2003)(quoting Augustine v. Trucco, 124 Cal. App. 2d 229, 246 (Ct.
10 App. 1954); see also Dryden v. Tri-Valley Growers, 65 Cal. App. 3d
11 990, 997 (Ct. App. 1977) (describing proximate causation as "a
12 vital element" of the cause of action).

### C.  Genuine Issues of Material Fact

Here, the Court finds that there are genuine issues of material fact concerning whether Harrah's caused the Tribe to rescind the Agreements, and concerning whether Harrah's conduct resulted in damage to NGV.

#### 1.  Proximate Cause

Contrary to NGV's contention that there is irrefutable evidence of proximate cause, see Pl.'s MPSJ at 16-20, Harrah's has set forth specific facts showing that there is a genuine issue as to whether Harrah's caused the Tribe to rescind the Agreements. Contrary to Harrah's contention that the Court can determine as a matter of law that Harrah's did not cause a breach or disruption of the contract, see Def.'s MSJ at 19-23, there is also evidence to support NGV's position.

NGV relies on the fact that Harrah's was negotiating with the

7

Tribe concerning developing and managing a casino and hotel at Point Molate during the months preceding the Tribe's decision to rescind the Agreements, which occurred on August 2, 2004. See Calvacca Decl.[5] Tab I ("April 30, 2004 Letter"); Tab. J ("May 12, 2004 Letter"); Tab K ("May 14, 2004 Letter"); Tab. M ("First Draft Discussion Document"); Tab. N ("Second Draft Discussion Document"); August 2, 2004 Letter.  Also, NGV has presented evidence in support of its contention that the Tribe was not prepared to terminate its relationship with NGV until it had a firm commitment from Harrah's that it would be the Tribe's new gaming partner.  See Calvacca Decl. Tab N ("Draft Discussion Document") at 1; Tab L ("June 16, 2004 Email").

However, Harrah's has presented evidence showing that the Tribe was unhappy with NGV's performance under the Agreements. This evidence supports Harrah's contention that the Tribe would have rescinded the Agreements even if Harrah's had never contacted the Tribe.  Michael Derry ("Derry"), C.E.O. of Black Oak Development, testified that by April of 2004, the Tribe was discussing terminating its contract with NGV.  Siegel Decl. Ex. E ("Dep. of Michael Derry") at 189:22-23, 202:17-23.  Derry described it as an "understatement" to say that "the relationship between the Tribe and the Fears-Noram team was very shaky by the

---

[5] Stephen J. Calvacca, counsel for NGV, filed a declaration in support of Plaintiff's Motion for Partial Summary Judgment. Docket No. 190.

8

1  Spring of 2004."[6]  Id. at 201:11-14.  Before Harrah's spoke to the
2  Tribe, the Tribe was concerned about NGV's failure to find a
3  parcel of land suitable to the Tribe, and NGV's unwillingness to
4  take seriously a parcel of land identified by the Tribe.  Id. at
5  189:22-191:11, 193:2-194:4.  At a meeting in Antioch, members of
6  the Tribe were disappointed when Kevin Gover, the NGV
7  representative, provided no assistance to the Tribe.  Id. at
8  197:23-199:11.  Daniel Kirby, who served as a liason between NGV
9  and the Tribe, testified that in the spring of 2004 he grew
10 concerned that the relationship between NORAM and the Tribe "was
11 leading towards collapse."  Siegel Decl. Ex. A ("Dep. of Daniel
12 Kirby") at 78:13-19.  Merlene Sanchez, the Tribe's Chairperson,
13 testified that at the time Harrah's approached the Tribe, the
14 Tribe did not believe NGV was performing on its obligation to get
15 land into trust for the Tribe.  Id. Ex. D ("Dep. of Merlene
16 Sanchez") at 91:16-21; 107:8-19.

17      Communications between the Tribe and the National Indian
18 Gaming Commission ("NIGC") in November and December of 2003 raised
19 serious questions about whether the Tribe should be doing business
20 with NGV.  See Dep. of Michael Derry at 209:6-15, 212:5-22, 213:4-
21 10.  At the very first meeting between the Tribe and Harrah's, the
22 Tribe indicated that it intended to terminate its relationship
23 with NGV.  Dep. of Clayton Rice at 116:2-13; Ex. F ("Dep. of James

---

[6] Mr. Fears was the majority shareholder of FEGV.  See Siegel Decl. Ex. P ("December 8, 2003 Letter") at GUI 00320.  North American Sports Management, Inc. ("NORAM") was working with FEGV on the Tribe's gaming project.  See id.  NORAM was owned by the Alan Ginsburg Family Trust.  Siegel Decl. Ex. C ("Dep. of John Gruttadaurio") at 5:17-18.

Levine") at 47:6-12. The Court concludes that there are genuine issues of material fact as to whether Harrah's actions caused a breach or disruption of the Tribe's contract with NGV.

### 2. **Damages**

Contrary to NGV's contention that it has established, as a matter of law, that it has been harmed or suffered damages as a result of Harrah's conduct, see Pl.'s MPSJ at 20-25, the Court finds that there are genuine issues of material fact relating to this element of the cause of action. As well as the evidence suggesting that the Tribe might have rescinded the Agreements even if Harrah's never contacted the Tribe, see Section IV.C.1., supra, there is also evidence suggesting the Agreements would not have survived regulatory review.

Before Harrah's contacted the Tribe, NORAM was concerned that the Agreements were not likely to be approved by the Bureau of Indian Affairs ("BIA") and the NIGC. Paul Filzer, General Counsel of NORAM, wrote a letter to the Tribe in which he proposed replacing and superceding the Agreements because the BIA may "be reluctant to exercise its discretion and accept land into trust for the Tribe." December 8, 2003 Letter at GUI 00322. Mr. Filzer was concerned about the provision in the Agreements that provided for a ten-year term, which exceeded the maximum seven-year term permitted under IGRA. Id.

There is evidence that Mr. Filzer was correct to be concerned about the regulatory hurdles the Agreements would have faced. In a letter to several United States Senators, NIGC Chairman Philip Hogen presented an "egregious example" of an unconscionable

10

agreement between a casino developer and a tribe, and the terms of this egregious example appear to be those contained in the Agreements between NGV and the Tribe:

> In an even more egregious example, the tribe had a 5-year obligation to pay rent equal to all the developer's costs, plus interest, plus an additional "rent" of 75% of net revenue. Following that, the tribe had a 10-year obligation to pay 16% of gross revenue, an amount roughly equal to 50% of net revenue, and all of these payments were to be made long after the developer ceased to providing services of any kind. . . . The Commission's review has enabled tribes to avoid such illegal and unconscionable agreements and has thus assured that they are the primary beneficiaries of their casinos.

Siegel Decl. Ex. EE ("February 1, 2005 Letter"). Based on this evidence that the Agreements would have faced significant regulatory hurdles, coupled with the evidence that the Tribe might have independently terminated its relationship with NGV, see Section IV.C.1, supra, a reasonable jury could conclude that NGV has not suffered damage as a result of Harrah's conduct. Indeed, this evidence is sufficient for a reasonable jury to conclude there have been no damages even without considering the Gaming Agency's decision to deny NGV a license.

Nevertheless, the Court cannot say, as a matter of law, that NGV has not been harmed by Harrah's conduct. See Def.'s MSJ at 23-25. It is plausible to assume that a valid and enforceable contract with a Northern California tribe that was eligible for restored lands has value, and if a jury determines that Harrah's caused a breach or disruption of the Agreements, and that the Agreements were capable of overcoming the hurdles identified

11

above, then a jury could conclude that Harrah's conduct resulted in damage to NGV. There are too many questions of fact here for the Court to make a determination regarding this element of the cause of action for intentional interference with contractual relations.

## V. CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Partial Summary Judgment, and DENIES Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

Dated: August 13, 2009

UNITED STATES DISTRICT JUDGE